IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION FILE NO. |
| FALEKA NIKELA UNDERWOOD, SR., | 1:16-cr-306-WSD-JKL-2 |
| Defendant. | |

## **FINAL REPORT AND RECOMMENDATION**

Defendant Faleka Nikela Underwood Sr. is charged in this case with one count of distribution of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D) (Count Three); one count of possession of ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count Six); and one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count Eight).[1]

This case is before the Court on Underwood's Motion to Suppress Statements [Doc. 20] and Motion to Sever Counts [Doc. 21]. A hearing on the

---

[1] The remaining counts in the indictment (Counts One, Two, Four, Five, and Seven) are charged against co-defendant Deshawn Evans Batchelor, who as of the date of this Report and Recommendation has not been arrested or arraigned.

motion to suppress was held before me on February 17, 2017. [*See* Doc. 47.] The transcript of that hearing will be referred to as "Tr." The parties have submitted post-hearing briefs on the motion to suppress [*see* Docs. 40, 41, 43]. For the following reasons, I **RECOMMEND** that Underwood's motions be **DENIED**.

I. **Motion to Suppress [Doc. 20]**

In May 2016, Underwood was arrested on a state warrant issued by a state magistrate in Coweta County, Georgia, charging him with theft by receiving a Nissan Armada that had been stolen from a car dealership in DeKalb County, Georgia. At the probable cause hearing in the Magistrate Court of Coweta County, Georgia, Underwood testified in his defense and made numerous admissions on direct and cross-examination that he dealt marijuana and possibly handled a bullet that was recovered in a stolen firearm. This testimony forms the basis for the distribution of marijuana and the felon-in-possession of ammunition charges (Counts Three and Six) in this case. [Doc. 40 at 5.] He maintains that his incriminating testimony at that hearing should be suppressed because he did not make a knowing or intelligent waiver of his Fifth Amendment rights. [*Id.* at 6.] He specifically contends that he did not realize that his testimony could be used against him. [*Id.* at 7.] He also contends that his lawyer failed to appreciate the

2

risk and thus provided ineffective representation by allowing or encouraging him to take the stand and failing to advise him properly of the risks of testifying. [*Id.*] For the reasons that follow, I conclude that Underwood's waiver was knowing, intelligent, and voluntary, and therefore, his motion to suppress should be denied.[2]

### A.   Background

#### 1.   Events Relating to Underwood's November 10, 2015 Arrest in College Park, Georgia

On November 10, 2015, Underwood and his son were involved in a physical altercation at an apartment complex in College Park, Georgia, where Underwood lived. (Tr. at 22-23.) College Park police officer Caleb Jackson arrived at the scene after someone called 911 to report hearing gunshots. (*Id.* at 23.) Officer Jackson asked Underwood what happened, and Underwood responded that he and his son were fighting and his son pulled a gun on him, so Underwood wrestled the gun from his son, and fired the gun twice into the air to

---

[2] Underwood initially sought to suppress four separate statements that he made to law enforcement. Following the evidentiary hearing and supplemental briefing by the parties, he now only challenges the voluntariness of incriminating statements that he made on examination during the probable cause hearing. [*See* Doc. 41 at 1-2 (identifying other statements that Underwood no longer seeks to suppress).]

3

scare his son. (Tr. at 27, 30, 44.) Officer Jackson arrested Underwood for discharging a firearm in the city limits and for being a felon in possession of a firearm. (Tr. at 34-35.) Attorney Jacoby Hudson represented Underwood in connection with the November 10 incident in Fulton County state court proceedings. (Tr. 96-97.)

### 2. Events Relating to Underwood's May 23, 2016 Arrest and Subsequent Probable Cause Hearing in Coweta County, Georgia

In May 2016, Investigator Mark D. Callahan with the Coweta County, Georgia, Sheriff's Office obtained a warrant from the Coweta County Magistrate Court for Underwood's arrest on charges of theft by receiving a stolen 2005 Nissan Armada. (Government's Exhibit ("GX") 5.) According to the warrant, on July 18, 2015, a Georgia State Patrol trooper observed a Silver Nissan Armada speeding on I-85 in Coweta County, Georgia. The trooper attempted to pull over the Armada; however, the vehicle fled. The Armada eventually stopped after a high-speed chase, and the driver and one passenger were arrested. At least three other passengers fled on foot and escaped. (*Id.*)

Investigator Callahan processed the Armada and determined that the vehicle was tied to a series of automobile and gun shop thefts that he had been investigating. (GX 5.) He dusted the vehicle for fingerprints, and Underwood's

4

fingerprints matched those taken from the driver's side of the vehicle and the door jamb. (*Id.*)

A firearm was also recovered from the Armada. (GX 5.) Law enforcement determined that the firearm had been stolen from a gun shop that had been hit in the string of gun shop burglaries. Nearly ten months earlier, in July 2015, law enforcement had recovered other guns and ammunition stolen in the same burglary, and Underwood's fingerprint was on a bullet found in one of those guns. (*Id.*)

Because Underwood's fingerprints were found both on the Armada and on the bullet inside the stolen firearm, Investigator Callahan concluded that Underwood was involved with the vehicle and gun theft ring and that he was one of the passengers who fled law enforcement after the high-speed chase. (GX 5.)

On May 23, 2016, Underwood was arrested on the Coweta County warrant and transferred to the Coweta County jail. (Tr. at 72.) On May 27, 2016, Underwood appeared before a Coweta County Magistrate for a probable cause hearing. (Tr. at 58.) Hudson appeared on Underwood's behalf at that hearing. (Tr. at 87.)

5

At the beginning of the hearing, the court advised Underwood that he had the Fifth Amendment right to remain silent and that if he had information he wished to share with the court, that he should do it through his attorney so he could protect that right. (GX 4 at 5:09.[3]) Underwood indicated to the Court that he understood that right. (*Id.*)

Investigator Callahan testified for the prosecution. (Tr. 87.) During Investigator Callahan's testimony, Underwood indicated to Hudson that he wanted to testify because he believed Investigator Callahan was lying. (Tr. at 91-92.) Hudson advised Underwood of his Fifth Amendment right to remain silent, that he had the right not to testify, and that his statements could be used against him. (Tr. at 92, 93, 104-05.) He also advised Underwood that if any testimony would have to be truthful "because there's going to be a record." (Tr. at 92.) He additionally told his client that there were no witnesses present in the courtroom who could testify on Underwood's behalf, and that "the best way you can tell your story, is tell your story to the judge." (Tr. at 93.) Hudson then asked

---

[3] Government's Exhibit 4, which was admitted into evidence at the evidentiary hearing in this case, is a DVD containing a video recording of the probable cause hearing. The file that contains footage from the hearing is entitled "Magistrate Courtroom B_20160527-1706_01d1b83a2e9822c5.trs". Citations to specific portions of the video are indicated by the time on the video-playing software.

Underwood "are you sure you want to testify?" and Underwood responded "I'm sure." (*Id.*) According to Hudson, Underwood made the decision to testify, and Hudson "verified" his decision because, based on what he knew about the cases involving the November 2015 incident and the allegations in the Coweta County matter, he "knew that [Underwood's] testimony couldn't hurt him." (Tr. 105.)

Underwood then took the stand. Before the examination began, the magistrate advised Underwood would waive his Fifth Amendment privilege by taking the stand and that he would be "wide open" on cross examination. (GX 4 at 5:35.) The magistrate also expressed his incredulity with Underwood's decision, remarking: "I can't believe you're going to do this, but we'll see." (*Id.*) Then, before Hudson began his examination, the magistrate had the following exchange with Underwood:

> **The Court**: Now, before Mr. Hudson starts, Mr. Underwood, I'm going to ask you . . . I hope I advised you that you have a Fifth Amendment right to remain silent before we started the hearing. And you understand that's a shield that gives protection to you that [the prosecutor] can't ask you any questions and I can't ask you any questions and you can invoke that Fifth Amendment privilege but you can also waive that privilege. And once you've waived it, you don't get it back. Did Mr. Hudson explain that to you?
>
> **Defendant**: Yes sir.

7

> **The Court**: And you believe it's in your best interest to testify to provide some defense for yourself?
>
> **Defendant**: Yes, I really do.

(GX 4 at 5:35-5:36.) Throughout the exchange, Underwood appeared attentive and engaged, and he repeatedly interjected affirmative responses to the court's advice, indicating that he understood what the court was telling him. (*Id.*)

On direct examination, Underwood explained that his fingerprints came to be found on the Armada because he probably sold marijuana to individuals inside the vehicle. Hudson asked Underwood if he sometimes sells marijuana, to which Underwood responded affirmatively. (GX 4 at 5:37.) Underwood also confirmed that he sells marijuana to persons he does not know and that he had likely sold drugs to individuals in the Armada referred to in the search warrant. (*Id.* at 5:37-38.) He went on to describe how his fingerprints may have gotten on the Armada during a drug transaction. (*Id.* at 5:38.)

Hudson also asked Underwood about how he came to be in possession of the bullet referred to in the warrant. Underwood testified that the bullet was in a different apartment in his complex that was being used as a drug den and "trap house," and that he might have picked up a bullet while he was there to obtain additional marijuana to sell. (GX 4 at 5:42-43, 5:45.)

8

On cross-examination, Underwood again admitted to selling and buying marijuana at his apartment complex. (GX 4 at 5:46.) He also testified that he possibly picked up the bullet, but denied that he possessed a firearm. (*Id.* at 5:47-48.) He also repeated his testimony that be believed his fingerprints got on the Armada because he likely touched the vehicle during a drug deal. (*Id. at* 5:48, 5:50.) Asked whether he could recall when he sold drugs to people in the Armada, Underwood stated that he could not say because "I sell marijuana to people everyday." (*Id.* at 5:50.)

Underwood's strategy apparently worked. At the conclusion of the hearing, the court found that the charges were "a reach too far" and concluded that the state had not met its burden to establish probable cause. (GX 4 at 6:23.)

### B. Discussion

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court created a presumption that evidence produced by custodial interrogation of a suspect is coerced unless the suspect is first advised of his constitutional right to remain silent and to have an attorney present during any questioning. 384 U.S. 436, 444-45 (1966).

A suspect may waive his Fifth Amendment privilege provided that he does so "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. This inquiry is twofold:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks and citations omitted). Ultimately it must be shown, by reference to the totality of the circumstances, that the defendant's statement was "the product of an essentially free and unconstrained choice." *Parker v. Allen*, 565 F.3d 1258, 1280 (11th Cir. 2009) (quoting *Hubbard v. Haley*, 317 F.3d 1245, 1252-53 (11th Cir. 2003)).

With respect to the first inquiry, I readily conclude that Underwood's decision to waive his Fifth Amendment privilege was voluntary. For a waiver to be involuntary, "there must be coercion by an official actor." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). Here, there is no evidence that the government took any coercive action against him to make him testify, much less

any "physical violence or other deliberate means calculated to break [his] will." *See Colorado v. Spring*, 479 U.S. 564, 574 (1987) ("Absent evidence that [the suspect's] 'will [was] overborne and his capacity for self-determination critically impaired' because of coercive police conduct, his Fifth Amendment privilege was voluntary under this Court's decision in *Miranda*." (second alteration in original) (citation omitted)). In fact, Underwood appears agree that his statements were voluntary in that he expressly states that he is not arguing the "coercion prong" of the analysis. [*See* Doc. 43 at 2.]

With regard to the second prong, after considering the arguments of counsel, I similarly conclude that Underwood knowingly and intelligently waived his rights. Underwood argues that his decision was not knowing or intelligent because he lacked "full awareness of the consequences of the decision." [Doc. 40 at 7.] He contends that Hudson was ill-prepared for the hearing and did not appreciate that admitting to dealing marijuana or possibly handling ammunition as a convicted felon in a stash house could lead to federal charges. I do not find that argument persuasive.

11

The Supreme Court has held that "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. *Spring*, 479 U.S. at 574. The Court explained:

> The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

*Id.* Thus, to show that Underwood's waiver was made knowingly and intelligently, all that the government must show is that he was aware of and understood that he had the right to remain silent and that anything he said could be used as evidence against him.

The record here shows that Underwood was advised of his Fifth Amendment rights at the beginning of the probable cause hearing, then by his lawyer, and finally again by the Court again before he testified. Underwood was certainly aware that statements he made or answers he gave after taking the stand would be made at his peril. His lawyer even warned him that the statements

would be recorded, so it was important that he tell the truth. Implicit in that warning is that what he said could be used against him. In sum, it is clear that Underwood understood that he had the right to remain silent and that his testimony might be used against him.

Underwood also argues that Hudson's bad advice "undermined and voided out any warning given by the court." [Doc. 40 at 10.] Underwood specifically asserts that Hudson told him that "there was no other way to get his story out and that nothing he said could possibly hurt him." [*Id.* at 7.] This is not entirely accurate. Hudson actually testified at the evidentiary hearing that he had no defense witnesses and that he told Underwood that "the best way you can tell your story, is tell your story to the judge." (Tr. 93.) That statement—which is an accurate statement of fact—is neutral. It does not advise Underwood to testify or to refrain from testifying; rather, it simply makes the obvious point that for Underwood to tell his side of the story to the court to defend himself at the preliminary hearing, he'd have to testify on his own behalf.

As for Hudson's supposed statement to Underwood that "nothing he said could possibly hurt him," Hudson did not testify that he made such a statement to Underwood. Rather, he stated that he thought Underwood's testimony would not

harm him. Specifically, Hudson testified that it was Underwood's decision to testify and that he (Hudson) "verified it" because based on what Hudson knew about the pending cases, he "knew that [Underwood's] testimony couldn't hurt him." (Tr. at 105.)[4]

But even if Hudson made a statement to Underwood that gave Underwood reason to think that his testimony would never come back to hurt him, I am not persuaded that such advice "completely undermined" the court's warning to Underwood. [*See* Doc. 43 at 3.] The court warned Underwood of the consequences of taking the stand just before Hudson began his direct examination, so the last words that Underwood heard before testifying were that he waived any Fifth Amendment protection by testifying and exposed himself to

---

[4] The cases that Underwood cites for the proposition that bad legal advice can undermine the voluntariness of a guilty plea do not support a contrary result. [*See* Doc. 40 at 11-12.] As with the decision to plea guilty, a suspect's decision to waive his Fifth Amendment right must be made with some knowledge of the potential consequences. But in the specific context of Fifth Amendment waivers, the Supreme Court has set a different bar as to the level of knowledge a defendant must have regarding the consequences of voluntarily providing a statement—*i.e.*, the suspect must be aware that he has the right to remain silent and that statements he made could be used against him. *See Spring*, 479 U.S. at 574; *see also Agee v. White*, 809 F.2d 1487, 1495 (11th Cir. 1987). In short, the types of consequences that a defendant must understand when entering a guilty plea is different than those a suspect must be aware of when deciding whether to waive his Fifth Amendment rights.

14

cross-examination. Moreover, Underwood indicated that he understood those rights, confirmed that Hudson had advised him of his rights, and expressly stated that he wanted to testify.

In sum, considering the totality of the circumstances, I conclude that the government has satisfied its burden to show that Underwood made an uncoerced choice to testify at the probable cause hearing and that he had the requisite level of comprehension such that his decision was knowing and intelligent. *See Moran*, 475 U.S. at 421. Accordingly, I **RECOMMEND** that Underwood's motion to suppress be **DENIED**.

## II. Motion to Sever [Doc. 21]

Underwood moves to sever Counts Three and Six from Count Eight of the Indictment. [Doc. 21.] Counts Three and Six arise out of events that allegedly occurred in July 2015, namely, that Underwood sold marijuana to individuals in the Nissan Armada and that his fingerprints were found on a bullet in a firearm recovered at the drug den and "trap house" apartment of co-defendant Batchelor. Count Eight relates to the November 2015 altercation between Underwood and his son, in which Underwood wrestled a gun away from his son.

Underwood argues that the offenses are misjoined under Fed. R. Crim. P. 8(a) because the firearm possession count is not of the same or similar character

15

as the other charges in the indictment and the events are not part of the same act or transaction. [Doc. 21 at 3-5.] Underwood also argues that even if properly joined, the court should exercise its discretion under Fed. R. Crim. P. 14 to sever the offenses, because, otherwise, it would be impossible for him to have a fair trial. [*Id.* at 5-7.]

The government responds that joinder is proper under Rule 8(a) because the firearm possession count is of the same or similar character as Count Six, which charges possession of ammunition by a convicted felon. [Doc. 24 at 2-3.] The government also argues that severance is not necessary under Rule 14(a) because Underwood would not be unfairly prejudiced by the spillover evidence from Counts Three and Six to Count Eight. [*Id.* at 3-6.]

Rule 8(a) of the Federal Rules of Criminal Procedure states:

> Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

The Eleventh Circuit construes Rule 8(a) broadly in favor of initial joinder. *See e.g.*, *United States v. Smalley*, 754 F.2d 944, 946 (11th Cir. 1985).

16

I agree that Count Eight is based on conduct that is distinct from the acts that give rise to Counts Three and Six. Nonetheless, I am persuaded that joinder is proper here because the firearm possession and the ammunition possession charges are of a similar class and character. Both charges allege violations of 18 U.S.C. § 922(g)(1), so the essential elements of each offense are nearly identical. *See United States v. Quilling*, 261 F.3d 707, 714 (7th Cir. 2001) (affirming denial of motion to sever charges of being a felon in possession of ammunition and a felon in possession of a firearm).

Because joinder of the counts against Underwood is proper, Underwood must show that severance is necessary because joinder of the offenses would be prejudicial. *See* Fed. R. Crim. P. 14(a). Citing *United States v. Jones*, 16 F.3d 487, 492 (2d Cir. 1994), Underwood argues that an unrelated firearm charge can have a spillover effect that jurors could not ignore. *Jones* is distinguishable because there, the court held that a felon-in-possession charge should have been severed because the charge necessarily introduced into evidence that the defendant had a felony conviction, and a limiting instruction to the jury did not cure the prejudice, but rather reinforced that the defendant was a convicted felon. *Jones*, 16 F.3d at 492-93. Here, no similar danger of spillover exists as to

17

Underwood's status as a convicted felon because Underwood is looking to bifurcate two felon-in-possession charges from each other. Therefore, even in bifurcated proceedings, a jury would hear evidence that Underwood is a convicted felon.

The only possible spillover that Underwood identifies is that a jury considering the felon in possession of a firearm charge would not hear that Underwood was engaged in dealing marijuana or was involved in an auto and gun theft ring. [Doc. 21 at 6.] The government disputes this, pointing out that Underwood's testimony at the probable cause hearing covered all the issues in this case and that the testimony is so intertwined that it is likely that the testimony will be admitted in its entirety at trial, even if the case were bifurcated. [Doc. 24 at 5.]

I have reviewed Underwood's probable cause hearing testimony several times, and I agree with the government that the areas of examination overlap considerably, and that it may be difficult as a practical matter to isolate certain areas of inquiry from others at trial. Thus, there is a real possibility that the preliminary hearing testimony would be introduced at two separate trials were this case bifurcated. Accordingly, interests of judicial economy support trying all

counts together. But even if only discrete parts of Underwood's hearing testimony could be admitted, any potential prejudice from having more than one crime charged in a single indictment can be cured by careful instructions from the Court that each count is to be considered separately. *See United States v. Harper*, 680 F.2d 731, 734 (11th Cir. 1982).

In sum, I conclude that joinder of the charges against Underwood are proper and that Underwood has not carried his burden to show that the joinder would be so prejudicial so as to warrant bifurcation. I therefore recommend that Underwood's motion to sever be **DENIED**.

### III.  Conclusion

For the foregoing reasons, I **RECOMMEND** that Underwood's motion to suppress [Doc. 20] and motion to sever [Doc. 21] be **DENIED**. There are no further motions or problems pending before me to prevent the scheduling of this case for trial as to this defendant. Therefore, this action is **CERTIFIED READY FOR TRIAL** as to Defendant Underwood.

IT IS SO RECOMMENDED and CERTIFIED this 8th day of June, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge